# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION FILE** |
| **v.** | **NO. 1:05-CR-477-MHC-GGB-2** |
| **JUAN PELAES PEREZ-URENA,** | |
| **Defendant.** | |

## ORDER

This action comes before the Court on Defendant Juan Pelaes Perez-Urena ("Defendant")'s Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018 ("Mot. for Compassionate Release") [Doc. 1782].

## I.   BACKGROUND

On December 12, 2006, a federal grand jury sitting in the Northern District of Georgia returned a Second Superseding Indictment charging Defendant with conspiracy to possess cocaine and methamphetamine with the intent to distribute (Count One), possession of cocaine and methamphetamine with the intent to distribute (Counts Five and Nine), use of a communication facility to facilitate a controlled substance offense (Count Seven), and conspiracy to launder funds

(Count Seventeen).  See Second Superseding Criminal Indictment [Doc. 677].  On

July 9, 2007, Count Nine was dismissed.  Order of Dismissal [Doc. 912].

Defendant proceeded to trial, and on February 7, 2008, was found guilty of

Counts One, Five, Seven, and Seventeen.  Jury Verdict [Doc. 1030].  On

September 19, 2009, Defendant was sentenced to life imprisonment on Counts One

and Five, 48 months as to Count Seven, and 240 months as to Count 17, with all

counts to run concurrently.  J. in a Criminal Case [Doc. 1185-1].  The Eleventh

Circuit affirmed both the conviction and the sentence of Defendant on December

14, 2009.  United States v. Namur-Montalvo, 356 F. App'x. 319 (11th Cir. 2009).

According to the Bureau of Prisons ("BOP") records, Defendant is

incarcerated at United States Penitentiary at Beaumont, Texas ("USP Beaumont").

See Juan Pelaes Perez-Urena, FED. BUREAU OF PRISONS, www.bop.gov/inmateloc

(last visited Oct. 19, 2021).  As of October 12, 2021, Defendant has served 16

years (192 months) of his life sentence.  Def.'s Reply in Support of Motion for

Compassionate Release ("Def.'s Reply") at 11.  With good time credit included,

Defendant has served 220 months.  Id.

In the pending Motion for Compassionate Release, Defendant seeks

compassionate release on two main grounds: (1) he is at high risk of death or

severe illness if he were to contract COVID-19 due to his medical conditions—

uncontrolled diabetes mellitus (Type II), diabetic kidney disease (also known is diabetic nephropathy), diabetic retinopathy, macular edema, hypertension, hyperlipidemia, and osteoarthrosis—combined with his age, and (2) Defendant is now at risk of going blind, of having a heart attack or stroke, and is unable to sufficiently ameliorate these conditions or receive the necessary treatment while remaining incarcerated.  Def.'s Suppl. Mem. in Suppl. of Def.'s Mot. for Relief Pursuant to 8 U.S.C. § 3852 (c)(1)(A) ("Def.'s Supp. Mem.") [Doc. 1795] at 11; Second Expert Decl. of Dr. Sanjay Kedhar ("Kedhar Decl.") [Doc. 1797-3] ¶¶ 8-12.  Defendant understands that, if he is released, he will be deported to Mexico. Def.'s Supp. Mem. at 30.  He has plans to live with his sister in the family home, and plans to obtain employment on his family's 50-acre lemon ranch.  Id. at 31. This employment will provide him with income and health insurance.  Id.  The government opposes the motion.  See generally, Govt's Opp'n to Def.'s Mot. for Compassionate Release ("Govt.'s Opp'n.") [Doc. 1798].

## II.    LEGAL STANDARD

Before the enactment of the First Step Act in December 2018, compassionate release was only available if the BOP filed a motion requesting it. 18 U.S.C. § 3582 (as effective Nov. 2, 2002, to Dec. 20, 2018); see also U.S.S.G. § 1B1.13 ("Upon motion of the Director of the Bureau of Prisons under 18 U.S.C.

§ 3582(c)(1)(A), the court may reduce the term of imprisonment . . .").  Now, however, the First Step Act enables a defendant to file a motion for compassionate release directly with the sentencing court, provided he first exhausts administrative remedies.  18 U.S.C. § 3582(c)(1)(A).  A prisoner can exhaust administrative remedies by (1) pursuing all avenues of appeal of the BOP's failure to bring a motion for modification of sentence, or (2) by filing a request for relief to which the warden does not respond within thirty days.  Id.  Where the exhaustion requirement is satisfied, a district court may reduce the sentence if a defendant shows that (1) extraordinary and compelling circumstances warrant a reduction; and, (2) a reduction would be consistent with applicable policy statements issued by the Sentencing Commission.  See 18 U.S.C. § 3582(c)(1)(A)(i).

The United States Sentencing Commission's policy statement regarding compassionate release, found in U.S.S.G. § 1B1.13 and the accompanying Application Notes, provides that extraordinary and compelling reasons for sentence reduction exist under the any of the following circumstances:

    (A)       Medical Condition of the Defendant.—

        (i)      The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory) . . . .

        (ii)     The defendant is—

(I)     suffering from a serious physical or medical condition,

(II)    suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)     Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)     Family Circumstances.—

(i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)     Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13, comment. (n.1).

Even if a defendant can show extraordinary and compelling reasons for compassionate release, the Court may not grant release unless it finds that the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3542(g), and the reduction is consistent with the policy statement. Policy Statement, U.S.S.G. § 1B1.13(2)-(3). The Court must also consider the applicable factors under 18 U.S.C. § 3553(a). Id. § 1B1.13.

## III. DISCUSSION

### A. Exhaustion of Administrative Remedies

Defendant contends that he has met the First Step Act's exhaustion requirement because he initially requested release from the BOP on May 13, 2021, and received no response from the warden as of June 15, 2021. Declaration of E. Katherine Tinto [Doc. 1795-7] ¶¶ 4, 6. Defendant filed his Motion for Compassionate Release on June 16, 2021, more than thirty days after May 13, 2021.[1] Def.'s Supp. Mem. at 38. Other courts have held that these circumstances satisfy the statute's exhaustion requirement. See, e.g., United States v. Christian,

---

[1] Defendant filed his pro se Motion for Compassionate Release on December 21, 2020. See Mot. for Compassionate Release. Defendant thereafter obtained counsel, who filed the supplemental Motion for Compassionate Release on June 16, 2021. Def.'s Supp. Mem. at 38. The Court will use the June 16, 2021, date for its analysis, given the government did not raise any objections to the exhaustion argument of Defendant. See generally, Govt.'s Opp'n.

No. 9:16-CR-80107-ROSENBERG, 2020 WL 2513101, at *3 (S.D. Fla. May 15, 2020) ("If the BOP has not acted on a request after 30 days, the prisoner may then file a motion with a court. If the BOP denies the prisoner's request in fewer than 30 days, the prisoner may turn to the court immediately."); United States v. Heromin, No. 8:11-cr-550-T-33SPF, 2019 WL 2411311, at *1 (M.D. Fla. June 7, 2019) (citing 18 U.S.C. § 3582(c)(1)(A)(i)) ("When seeking compassionate release in the district court, a defendant must first file an administrative request with the BOP and then either exhaust administrative appeals or wait thirty days after submitting his request to the BOP."); see also United States v. Willingham, No. CR 113-010-1, 2020 WL 2843223, at *1 (S.D. Ga. June 1, 2020) (considering the merits of a motion where the inmate "submit[ted] evidence that the Warden of FCI Coleman Low has denied her request for consideration of compassionate release based upon her current health concerns"). Accordingly, this Court finds that Defendant has satisfied the exhaustion requirement.

## B. Extraordinary and Compelling Circumstances

Defendant's Motion for Compassionate Release makes a compelling case that the combination of his underlying medical conditions—including uncontrolled diabetes mellitus (Type II), diabetic kidney disease (also known is diabetic nephropathy), diabetic retinopathy, macular edema, hypertension, hyperlipidemia,

7

and osteoarthrosis, along with his age—make him highly susceptible to COVID-19 and that the BOP is unable to adequately protect Defendant against the risk of infection at the facility where he is currently housed. Def.'s Supp. Mem. at 3-4; Kedhar Decl. ¶¶ 8-12. Indeed, some of these conditions, standing alone, have led courts to grant compassionate release.

The current environment at USP Beaumont also contributes to the risk he will become severely ill or die. Additionally, the government does not dispute that Defendant currently is unable to care for himself and is not getting the medical care that he needs from the BOP. Based upon all these factors, the Court finds that extraordinary and compelling circumstances warrant a reduction in sentence.

### 1. Defendant's medical conditions make him more susceptible to COVID-19.

It is undisputed that COVID-19 and the related coronavirus is widespread in the United States, highly contagious, and that individuals with compromised immune systems and certain medical conditions are more susceptible to and more likely to become severely ill or die from the disease. See, e.g., WORLD HEALTH ORG., Coronavirus disease (COVID-19), https://www.who.int/health-topics/coronavirus#tab=tab_1 (last visited Oct. 19, 2021). As a 61-year-old male with long-term chronic kidney disease, diabetes, and hypertension, Defendant falls within several subgroups of people who are more at risk for contracting and

becoming severely ill or dying from COVID-19. <u>See, e.g.,</u> <u>People with Certain</u> <u>Medical Conditions (COVID-19)</u>, CTRS. FOR DISEASE CONTROL AND PREVENTION (last visited Oct. 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html; <u>United States v. Oreste</u>, No. 14-20349-CR, 2020 WL 4343774, at *2 (S.D. Fla. Apr. 6, 2020) (granting compassionate release for a defendant with conditions including diabetes and heart issues because "[t]hese conditions put Mr. Oreste at a high risk of death from COVID-19. Based on the increased risk of death posed by COVID-19 pandemic and Mr. Oreste's severe health conditions, the Court finds that extraordinary and compelling reasons warrant Mr. Oreste's release."); <u>United States v. Beam</u>, No. 4:17-cr-00463-MHH-GMB-1, 2020 WL 7327988 (N.D. Ala. Dec. 11, 2020) (granting compassionate release to a 43-year-old defendant with diabetes and hypertension after finding that diabetes patients tend to have COVID-19 mortality rates that are over two times mortality rates for those without diabetes, and that hypertension leaves patients at a higher risk of severe outcomes if they contract COVID-19); <u>United States v. Blake</u>, No. 15-CR-80018, 2020 WL 4677309, at *6 (S.D. Fla. Aug. 12, 2020) (granting compassionate release to a 70-year-old defendant with stage 4 kidney disease and other medical conditions, and stating, "[t]he Court notes updated guidance from the CDC reflects having chronic kidney

disease of any stage increases [an individual's] risk for severe illness from COVID-19.") (citations omitted). Defendant's Medical Records also indicate that Defendant is obese, which puts him at further risk. Medical Records [Doc. 1795-2] at 57. The government concedes that "Defendant is likely at increased risk of severe COVID-19 illness because of his underlying conditions." Gov't Opp'n at 9.

Another court in our circuit looked at a similarly-situated defendant in United States v. Friedlander, No. 8:08-CR-318-T-27TGW, 2021 WL 2661109, at *1 (M.D. Fla. June 29, 2021). Just like Defendant in this case, Friedlander suffered from diabetes, diabetic retinopathy, hypertension, and chronic kidney disease. Id. at *2. The Friedlander court found this combination of ailments coupled with the fact that the Defendant was 91-years-old, was a sufficient basis to grant his motion for compassionate release. Id. at *3. See also United States v. Weems, 477 F. Supp. 3d 1301, 1309 (granting compassionate release to a defendant with Type II diabetes mellitus and hypertension); United States v. Feucht, 462 F. Supp. 3d 1339, 1342 (S.D. Fla. 2020) (finding extraordinary and compelling reasons to reduce Feucht's sentence because he suffered from Type II diabetes mellitus and hypertension and was therefore vulnerable to severe illness from COVID-19).

Defendant has received the COVID-19 vaccine, but has not yet received his booster even though he got his second dose of Pfizer-bioNTech vaccine over six months ago.  Def.'s Supp. Mem. at 14; Def.'s Reply. at 4.  However, vaccination status alone is not dispositive of whether compassionate release should be granted.  The Centers for Disease Control and Prevention ("CDC") notes that "the risk for SARS-CoV-2 infection in fully vaccinated people cannot be completely eliminated as long as there is continued community transmission of the virus," and also that "fully vaccinated persons are more commonly observed with the Delta variant than with other SARS-CoV-2 variants." CTRS FOR DISEASE CONTROL AND PREVENTION, Science Brief: COVID-19 Vaccines and Vaccination, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html (last visited Oct. 18, 2021).  Because of Defendant's severe underlying conditions, his vaccination status does not fully mitigate the likelihood of Defendant becoming severely ill or dying if he contracts COVID-19.

Defendant cites United States v. Pappa, No. 95-00084-CR-LENARD, 2021 WL 1439714 (S.D. Fla. Apr. 1, 2021), as support for his compassionate release.  In Pappa, the court found extraordinary and compelling reasons for a reduction in the defendant's sentence based on her underlying medical conditions notwithstanding the fact that Pappa received the first dose of a COVID-19 vaccine.  Id. at *3-4

(S.D. Fla. Apr. 1, 2021). This is in accord with decisions from other jurisdictions.

See United States v. Sweet, No. 07-20369, 2021 WL 1430836, at *2 (E.D. Mich. Apr. 15, 2021) (granting compassionate release to Sweet due in part to his age and chronic kidney disease despite his receipt of the Moderna vaccination and noting that "[a]lthough the Court agrees with the government that recovering from COVID-19 and being fully vaccinated decreases one's likelihood of severe COVID symptoms, recent data reveals that the threat of severe illness or death from COVID-19, while diminished, is nevertheless real"); United States v. Manglona, No. CR14-5393RJB, 2021 WL 808386, at *1 (W.D. Wash. Mar. 3, 2021) ("The Court's conclusion is that vaccination during the pendency of the Motion for Compassionate Release . . . should not, and does not, in some way trump the Court's consideration of the motion."); United States v. White, No. 3:17-CR-00104-2, 2021 WL 268719, at *4 (M.D. Tenn. Jan. 27, 2021) (citation and punctuation omitted) ("[J]ust this month variants to the SARS-CoV-2 strain were identified that may (or may not) allow the virus to spread more quickly, lead to more severe or less severe illness, and evade vaccine-induced immunity). Although the Court believes that being fully vaccinated for COVID-19 significantly protects most of its recipients from the most severe consequences of the disease, these benefits decrease if there are significant underlying health

conditions which makes the recipient still vulnerable to the serious effects of contracting COVID-19.  In this case, Defendant suffers from more significant underlying health conditions than those cases whether the courts have found the COVID-19 risk is largely ameliorated by vaccination.  See e.g., United States v. Ellis, No. 3:16-CR-108-BJD-MCR, 2021 WL 2351737, at *1 (M.D. Fla. June 9, 2021) (denying relief to a vaccinated defendant who was suffering from diabetes, hypertension, obesity, sleep apnea, diabetic macular edema, and having undergone bladder surgery, but the court made no mention of the defendant having diabetic kidney disease, diabetic retinopathy, hyperlipidemia, or osteoarthrosis); United States v. Castro, No. 8:19-CR-487-VMC-AAS, 2021 WL 4593855, at *2 (M.D. Fla. Oct. 6, 2021) (denying relief to a vaccinated defendant who was suffering from diabetes, hyperlipidemia, hypertension, hypothyroidism, and vision problem, but the court did not mention the defendant having diabetic kidney disease).

### 2. The prison conditions further exacerbate the risks to Defendant.

The COVID-19 risks to Defendant are exacerbated by Defendant's living conditions at USP Beaumont.  As another judge in this district recently explained,

> "even without a highly contagious pandemic, there is always an unfortunate risk that detainees will be exposed to certain communicable diseases." Matos [v. Lopez Vega, No. 20-CIV-60784-RAR,] 2020 WL 2298775, at *10 [(S.D. Fla. May 6, 2020)].  Detained populations also tend to be in poorer health and suffer from a higher prevalence of

infectious and chronic diseases than the general population.  Fraihat v. U.S. Immigration & Customs Enf't, 445 F. Supp. 3d 709, 723 (C.D. Cal. 2020) (discussing CDC Interim Guidance and granting preliminary injunction to inmate defendants in the light of COVID-19).  And to make matters worse, medical care of prisoners is often limited at the best of times.  See U.S. Dep't of Justice Office of the Inspector General, Review of the Federal Bureau of Prisons' Medical Staffing Challenges (Mar. 2016) (finding BOP experienced chronic medical staff shortages, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions).

United States v. Ullings, No. 1:10-cr-406-MLB, 2020 WL 2394096, at *3 (N.D. Ga. May 12, 2020) (reducing the defendant's sentence to time served).  The CDC has recognized the multitude of "unique to implementing testing for SARS-CoV-2" in correctional facilitates.  CTRS. FOR DISEASE CONTROL AND PREVENTION, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Oct. 21, 2021).  As of March 2021, USP Beaumont had 59 inmates with COVID-19, the highest number in the federal prison system at that time.  Katie Rice, Coleman facility among federal prisons with most COVID-19 cases, data shows, ORLANDO SENTINEL (Mar. 31, 2021), https://www.orlandosentinel.com/news/crime/os-ne-covid-outbreak-coleman-

federal-correctional-institution-20210401-ardau33vmjbr5bmamp6ugm53mi-

story.html.[2]

### 3. Defendant has diminished ability for self-care within prison because his health needs are not currently being properly attended to by the BOP.

Defendant contends that he is unable to provide sufficient self-care to protect

himself from the risk of COVID-19 while he is incarcerated at USP Beaumont.

Def.'s Supp. Mem. at 23.  The government has not contested this point.  Defendant

appears to argue that this is in part due to the vaccination rate at USP Beaumont,[3]

and due in part to the fact "many come and go from outside the community."  Id.

"In contrast, if released, [Defendant] would be able to take more precautionary

measure to lower his risk of getting COVID-19."  Def.'s Second Supp. Mem. at 6.

Defendant's Type II diabetes, which developed while Defendant was

incarcerated, has progressed, and remains uncontrolled today despite medical care.

---

[2] The article does not list the total number of inmates.  However, as of October 21, 2021, there were 1,356 total inmates at USP Beaumont.  BOP, USP Beaumont, https://www.bop.gov/locations/institutions/bmp/ (last visited Oct. 21, 2021).

[3] The vaccination percentage varies across the filings, as it is a changing number. According to Defendant's Second Supplemental Memorandum in Support of Defendant's Motion for Relief pursuant to 18 U.S.C. § 352(c)(1)(A) ("Def.'s Second Supp. Mem.") [Doc. 1797] at 4, approximately 61% of the inmate population has been vaccinated.

Def.'s Supp. Mem. at 24; BOP Medical Records; Updated Medical Records [Doc 1797-2]. The government does not contest that Defendant's diabetes is uncontrolled. Defendant contends that his diabetes related illnesses—diabetic kidney disease, proliferative diabetic retinopathy, and greatly increased risk of coronary disease—have also progressed. Def.'s Second Supp. Mem. at 9. Additionally, the evidence before the Court reveals that Defendant has received no follow-up care or testing related to his kidney function in the wake of receiving alarming test results in June of 2020. Id. at 14. Both the diabetes and the kidney disease in particular are two illnesses that make him more susceptible to COVID-19. CTRS. FOR DISEASE CONTROL AND PREVENTION, People with Certain Medical Conditions (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 14, 2021). In short, the Court finds that Defendant already was at a higher risk for contracting and becoming seriously ill or dying from COVID-19 because of his medical conditions. The record also establishes that he is not receiving appropriate treatment that prevents him from taking the most basic precautions to protect himself from getting the virus.

The lack of treatment Defendant is receiving regarding his vision problems is also of concern. Defendant is at risk of going blind. Kedhar Decl. ¶ 12. He

suffers from proliferative diabetic retinopathy and, on February 7, 2020, it was recommended that he return to an eye specialist in six months. BOP Medical Records at 19. Yet his scheduled target appointment date in August of 2020 was canceled, and a total of 17 months went by without him seeing an eye doctor. Updated BOP Medical Records [Doc. 1797-2] at 7. Unfortunately, Defendant's vision problems have worsened, and he now has macular edema. See Kedhar Decl. ¶¶ 8-12 ("PDR is a progressive and serious condition and, based on the review of the most recent medical records, is getting worse for Mr. Perez-Urena. If not properly treated, PDR can result in the loss of both central and peripheral vision and ultimately result in blindness"). "Requiring Defendant to continue to serve his sentence in federal custody while seriously ill and with the risk of inadequate medical care means that his sentence would be significantly more laborious than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2)." United States v. Vazquez Torres, No. 19-CR-20342, 2020 WL 4019038, at *4 (S.D. Fla. July 14, 2020) (internal citations and punctuation omitted).[4]

---

[4] In Torres, the court granted compassionate release after noting the inadequate medical care of the defendant. The government objects to raising inadequate medical concerns, arguing that a civil claim is the correct avenue for relief for such

In summary, Defendant's medical conditions make him more likely to become severely ill or die from COVID-19. The current conditions at USP Beaumont exacerbate this risk. The record also reflects he is not receiving the medical care needed for his medical conditions. All these factors together warrant a finding of extraordinary and compelling circumstances that support the granting of his Motion for Compassionate Release.

### C.     Danger to the Safety of the Community and § 3553(a) Factors

The Court also finds that Defendant does not present a danger to the community, that modification of sentence is consistent with U.S.S.G. § 1B1.13, and that the relevant § 3553(a) factors favor granting the relief he seeks. This Court may not grant Defendant's Motion for Compassionate Release unless it finds that Defendant "is not a danger to the safety of any other person or to the community." Policy Statement, U.S.S.G. § 1B1.13 (2); see United States v. King, 849 F.2d 485, 487 n.2 (11th Cir. 1988) (noting that "the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The Committee intends that the concern about safety be given a broader construction than merely danger of

claims. Govt. Opp'n at 11-12. However, inadequate medical care is often an issue raised on Motions for Compassionate Release, several of which are cited herein.

harm involving physical violence.").  The Court also considers the 18 U.S.C.

§ 3553(a) factors, which include (1) the nature and circumstances of the offense

and the history and characteristics of the defendant, (2) the need for sentence

imposed to reflect the seriousness of the offense, among other things, (3) the kinds

of sentences available, (4) the kinds of sentence using the sentencing range; (5) any

pertinent policy statement; (6) the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar

conduct; and (7) the need to provide restitution to any victims of the offense.  18

U.S.C. § 3553.  Here, the balance of the factors supports compassionate release.

The Court has considered and weighed all the pertinent factors set forth above.

The most critical considerations, in the Court's opinion, are set forth below.

### 1. The nature of the offense and the history and characteristics of Defendant

Prior to the convictions for which Defendant is presently incarcerated,

Defendant was convicted in 1981 for possession of narcotics for sale.  PSR ¶ 119.

A search of the residence where Defendant and four other individuals were located

revealed a .22 caliber semi-automatic handgun with ammunition.  Id.  Defendant

was sentenced to five years in prison to serve one year, with the balance probated.

Id.  In 1991, Defendant was convicted of possession of heroin with intent to

distribute.  Id.  at 120.  He served approximately three years in custody, and then

was deported to Mexico after his sentence was complete.  Id.  Balanced against the history, Defendant is now a 61-year-old man with serious medical conditions who has been incarcerated for a substantial amount of time.  During his incarceration Defendant has obtained a GED, completing an anger management course, and obtained successful employment within UNICOR.  Def.'s Supp. Mem. at 8, 36.  His supervisors commended his initiative and helpfulness.  Letter from UNICOR Supervisor Whitaker [Doc. 1795-4].  The Court finds that the history and characteristics of Defendant are neutral and do not weigh heavily for or against compassionate release.

### 2.      The need for sentence to reflect seriousness of the offense

The Court next considers the need for the sentence imposed to achieve the goal of sentencing which are the following: (1) reflecting the seriousness of the offense, (2) promoting respect for the law, (3) providing just punishment, (4) deterring future criminal conduct, (5) protecting the public, and (6) providing the defendant with any needed training or treatment.  18 U.S.C. § 3553(a).  Defendant's crimes for which he was convicted—although serious—did not involve violence, and occurred more than fifteen years ago.  Perhaps most persuasive to the Court, with one exception, each of Defendant's co-conspirators has been released.  Pl.'s Supp. Mem. at 33-34; Def.'s Supp. Mem. at 34.  Jose

Magana Barajas and Antonio Coutoa-Rodriguez were released in June of 2019. PSR at ¶¶ 37, 60.  Javier Alvarez Lopez—a director of the conspiracy and the person that directed Mr. Perez-Urena's activities—was granted compassionate release on March 21, 2021.  United States v. Alvarez-Lopez, 1:05-cr-00477-CC-GGB, Doc. 1794 (N.D. Ga. Mar. 12, 2021); PSR at ¶¶ 30-31.  The remaining co-defendant, Trinidad Flores-Sotelo, will be released on November 4, 2022. FEDERAL BUREAU OF PRISONS, Find an inmate, https://www.bop.gov/inmateloc/;jsessionid=24F4661F21F829BE35875E969D63D B63 (last visited Oct. 22, 2021) (Trinidad Flores-Sotelo to be released on November 4, 2022).  As of June 12, 2021, Defendant has served 220 months with good time credit.  Def.'s Supp. at 31.  The fact that all but one of the other individuals associated with the crime for which Defendant has been incarcerated have been released suggests that a just punishment does not require further incarceration.

Defendant also argues that if he were to be sentenced today, his sentence would be 180 months (15 years), which would be the mandatory minimum for the

underlying offense today. Def.'s Supp. at 33.[5] The government concedes that the

mandatory minimum would in fact be 180 months (15 years), but goes on to argue

that if sentenced today, his guideline range would amount to 262 to 405 months.

Govt.'s Opp. at 14-15. Even if this Court applied the Government's estimate of a

revised guideline range, Defendant has served between 54%-83% of such a

sentence as of October 12, 2021, factoring in his good time credit. Def.'s Reply. at

11. The Court believes that a reduced sentence for Defendant would still reflect

the seriousness of his crimes, promote respect for the law, provide just punishment

for his offenses, and deter others from committing similar offenses.

Finally and significantly, the court finds that there is no continued need to

protect the community from Defendant, as he likely poses no danger. He is 61

years old, suffers from several health challenges, and has been in custody for more

than fifteen years. He has an exceptional disciplinary record, with only one

disciplinary issue over fifteen years of incarceration for a relative minor infraction

of having unauthorized stamps. Inmate Discipline Data, Doc. No. 1795-5.

Moreover, the BOP has labeled Defendant as a minimal recidivism risk level.

---

[5] Defendant notes that his 1981 conviction would no longer count as a predicate
offense justifying a 851 enhancement, because it only carried a maximum sentence
of four years. Def.'s Supp. Mem. at 33.

Inmate Profile, Doc. No. 1795-5.  This factor therefore supports compassionate release.

### 3.     The kinds of sentences available

For the reasons previously enunciated above, the Court finds that this factor supports compassionate release.

### 4.     Pertinent policy statements

Pursuant to U.S.S.G. § 1B1.13(2), after finding an extraordinary and compelling reason for a reduction, the Court must consider whether defendant is a danger to the community, as provided in 18 U.S.C. 3142(g).

> Section 3142(g) lists several factors for the district court to consider in determining whether a defendant is a danger to another person or the community, including (1) the nature and circumstances of the offense charged, including whether the offense involved a firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including their criminal history and whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

United States v. Wren, 851 F. App'x 931, 936 (11th Cir. 2021).  The Court's analysis here is the same as expressed above due the similarity of the factors which have been considered.

The Court adds that Defendant's release plan further suggests he is not a risk to the community. Defendant understands that if he is released, he will be deported to Mexico. Def.'s Supp. Mem. at 30. His family in Mexico can provide him stability, financial support, and medical care in Mexico. Id. Defendant has plans to live with his sister, and will be able to obtain on his family's lemon ranch in Mexico. Id. at 31. This job will provide him health insurance, and if he is unable to work then his family has committed to support him. Id. Therefore, the Court finds that Defendant is not a danger to the community.

### 5.     The need to avoid unwarranted sentence disparities

Because of the release of his co-defendants, this factor weighs heavily in favor of granting compassionate release.

In sum, the Court finds that Defendant's recidivism risk is low, and the Court has no reason to believe that Defendant is a danger to the community.

## IV.   CONCLUSION

Accordingly, it is hereby **ORDERED** that Defendant Juan Pelaes Perez-Urena's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018 [Doc. 1782], is **GRANTED**. Defendant's prison sentence is **REDUCED** to **TIME SERVED**.

It is further **ORDERED** that the Bureau of Prisons shall release Defendant from its custody and remanded to the custody of the United States Marshals Service after a fourteen (14) day quarantine period and medical clearance to minimize the possibility of any spread of COVID-19. The United States Attorney for the Northern District of Georgia is **DIRECTED** to notify the Bureau of Prisons of the issuance of this Order so that its provisions can be put into effect as quickly as possible. Upon the expiration of the fourteen (14) day quarantine period, Defendant shall be released to the custody of the United States Marshals Service for surrender to an authorized Bureau of Immigration and Customs Enforcement official for deportation proceedings in accordance with the Immigration and Nationality Act. If more than fourteen (14) days are needed to make appropriate travel arrangements and ensure Defendant's safe release, the parties shall immediately notify the Court.

If Defendant is not deported and is released from custody, he shall be placed on supervised release for a period of ten (10) years, under the same terms and conditions as set forth in his September 22, 2008, Judgment and Commitment Order [Doc. 1185-1].  Within 72 hours of any such release, Defendant shall report in person to the United States Probation Office in the district to which Defendant is released.

**IT IS SO ORDERED** this 26th day of October, 2021.

_____
MARK H. COHEN
United States District Judge